**STATE of Tennessee, Appellee,**

v.

**Billy Harold BREWER, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Jan. 16, 1997.

No Permission to Appeal Applied for to the Supreme Court.

Donald E. Holt, Florence, Alabama, at trial, James Daniel Freemon, Lawrenceburg, at trial and on appeal, for Appellant.

Charles W. Burson, Attorney General of Tennessee and Ellen H. Pollack, Assistant Attorney General, Nashville, and T. Michael Bottoms, District Attorney General and Robert C. Sanders, Lawrenceburg, for Appellee.

## OPINION

TIPTON, Judge.

The defendant, Billy Harold Brewer, was convicted in a jury trial in the Wayne County Circuit Court of official misconduct and coercion of a juror, Class E felonies. As a Range I, standard offender, he was sentenced to two years in the Department of Correction for each conviction. The trial court placed the defendant on immediate probation and ordered that he pay court costs and spend 200 hours performing public service work.[1] The defendant appeals as of right contending that the evidence was insufficient to sustain the convictions and that the trial court erred in

---

1. In his brief, defense counsel notes that the defendant had successfully completed his probationary period.

not properly instructing the jury on his statutory defense.[2] We disagree.

## I

### Official Misconduct

In 1989, the defendant, Billy Harold Brewer, was Waynesboro's Chief of Police. He had served on the police force for more than twenty years and was a lifelong resident of Wayne County. The charges in this case were part of the aftermath of a minor traffic accident involving his nephew's wife. The defendant was neither a party to the accident nor was he involved in the initial investigation. We discuss the facts of the accident to place in context the conduct for which the defendant was convicted.

Mary Ann Brewer, the wife of the defendant's nephew, went to the grocery store near the Waynesboro town square late in the afternoon of December 28, 1989. When she left the store shortly after 5:00 p.m., it was already dark and a light rain was falling. She backed her Chevrolet Cavalier out of the head-on parking spot and headed west on the one-way street that borders the square. The street has two lanes, and at first, Ms. Brewer was in the right lane. At some point before she reached the end of the block, she moved into the left lane. Joel Nutt, the driver of the other vehicle involved in the accident, was driving a Bronco that belonged to his brother, Steve. He was driving in the left lane when he passed the Cavalier as it backed out of its parking place.

The version told by the two parties diverges significantly at this point. Mr. Nutt testified that as he neared the corner, Ms. Brewer's car cut in front of him. Although he braked and swerved, he could not avoid hitting her. According to Mr. Nutt, the Bronco struck the Cavalier's left quarter panel where it left a long black streak. Because of the manner in which the Cavalier slid, the Bronco ended up sitting just behind the Cavalier. Mr. Nutt examined her car and found no dents in the quarter panel and no damage to the rear bumper. The Bronco's front bumper was barely scratched. Although he did not believe it was necessary to call the police, he told Ms. Brewer it was up to her. Ms. Brewer, on the other hand, testified that after pulling out of the parking place, she moved into the left lane. When she stopped at the corner, the Bronco hit her from behind and pushed her out into the intersection. The Bronco could not stop and went up onto the curb and finally came to rest nearly parallel to her car. According to Ms. Brewer, Mr. Nutt backed the Bronco into position behind her car before he got out to talk to her. She went to a nearby store and called the police. There were no witnesses to the accident. She testified that Mr. Nutt told her that he would buff out the long smear on the quarter panel because the accident was his fault.

Within moments, two police cars arrived. Lieutenant Carl "Goody" Brewer arrived first, closely followed by Sergeant Buddy Nutt. Lieutenant Brewer is the defendant's brother and Ms. Brewer's uncle by marriage. Buddy Nutt is a distant cousin of Joel Nutt.[3] Lieutenant Brewer asked Sergeant Nutt to handle the investigation because of his family connection with Ms. Brewer. At that time, Sergeant Nutt had not recognized Joel Nutt.[4] Several days later, on January 5, 1990, Sergeant Nutt filed the accident report.[5] Lieu-

2. Defendant's brief also challenges the trial court's denial of his Motion for Judgment of Acquittal. The state contends that defendant has waived this issue because he presented evidence on his behalf after the motion was denied. Rule 29(c) of the Tennessee Rules of Criminal Procedure permits a motion for judgment of acquittal to be renewed within 30 days of the date of the order of the sentence. A motion for judgment of acquittal requires that the trial court determine the sufficiency of the evidence. Tenn.R.Crim.P. 29(a). Because defense counsel raised the issue of sufficiency of the evidence in the motion for new trial, the issue has not been waived. However, with a denial of a motion for judgment of acquittal being inextricably linked to the sufficiency of the evidence, we consider the issues together.

3. In 1989 Sergeant Nutt was the criminal investigator for the city police department. He was Sheriff of Wayne County at the time the case was tried.

4. Joel Nutt had moved to Indiana and was in Tennessee visiting his family.

5. It isn't clear in the record which officer took the lead in questioning the parties to the accident. Buddy Nutt testified that Lieu-

tenant Brewer's signature appears on the report indicating that he reviewed it. The diagram and description of the accident are consistent with Mr. Nutt's version. However, the report shows that both drivers had failed to yield.

At some point, Ms. Brewer obtained a copy of the report. She immediately spoke to the defendant and told him that the report was wrong. She drew her version of the diagram over the top of the one drawn by Buddy Nutt. Shortly thereafter, Earl Brewer, her husband, took a copy of the accident report to the Nutt's insurance agent to file a claim. The agent had previously received a copy of the report from Steve Nutt. When she looked at the report offered by Earl Brewer she noticed that it contained whited out areas. She refused to accept the report unless the corrections were initialed by the reporting officer. Gilda Staggs, the clerk in charge of filing accident reports, testified that she saw the defendant whiting out portions of an accident report. However, she did not know which report he had changed.

Sergeant Nutt testified that the defendant told him and Lieutenant Brewer that the report was not accurate and that they should fix it. According to Nutt, the defendant told him he wanted "that woman off his back." After the meeting with the defendant, Sergeant Nutt filed a "supplement" to his previous report.[6] The supplement is dated January 15, 1990. The diagram of the accident shows the two cars as they were positioned when the police arrived, and the narrative description of the accident is closer to Ms. Brewer's version. The first page is identical to that in the earlier report. Apparently, the supplement was not satisfactory because he produced a third report in response to a note from the defendant.[7]

The third report is also dated January 15, 1990. The defendant's name appears on the signature line as reviewing officer. Sergeant Nutt testified that the defendant did not actually sign the report and that Lieutenant Brewer had not signed the two previous ones. He had written their "signatures" on the reports, which he said was standard practice when a supervisor was not available when a report was complete. The diagram and the description of the accident contained in the third report are identical to that found in the supplement. However, the page does not have "supplement" written at the top. The first page of the report shows that the damages to Ms. Brewer's vehicle were to the rear end and that the damages to Mr. Nutt's vehicle extended across the front. Neither driver is cited for failure to yield, and the box, where checks previously indicated that the vehicles had not been moved, contains a question mark.

■ On this evidence the jury convicted the defendant for official misconduct. The defendant contends that the evidence in the record is insufficient to prove beyond a reasonable doubt that he acted intentionally and knowingly to benefit or harm another when he ordered the officers to correct an inaccurate accident report. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that we may not reweigh the evidence but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in

Brewer spoke to the parties and reported what they said to him. Lieutenant Brewer testified that both officers were present during the interview.

6. The signature line for the reviewing officer is not visible in the copy of the supplemental report contained in the record. However, when Lieutenant Brewer was shown a copy of the supplement at trial, he stated that, although he did not recall seeing this version, his signature was on it.

7. The note, which was left in Sergeant Nutt's mail slot, said:

  Goody & Buddy,
  I want this acc report fix like sopose(sic) to be *to night.*
  You got veh *one* in fault in place and veh *two* in fault in another.
  Fix it one way or another.
    Bill
  I want by in the morning.

favor of the state. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

█ Our law provides that official misconduct involves a public servant who has "with the intent to obtain a benefit or to harm another, intentionally or knowingly" performed an act that is "an unauthorized exercise of official power" or "under color of office or employment that exceeds the servant's official power." T.C.A. § 39–16–402(a)(1)–(2).[8] Evidence presented at trial shows that the Waynesboro chief of police, a public servant as defined by T.C.A. § 39–16–401(3)(A), exceeded his official power in this case. When the evidence is viewed in the light most favorable to the state, the record shows that he first attempted to modify the accident report by whiting out certain portions. When the insurance agent refused to accept the modified copy, he used his official position to order subordinates to rewrite the report. The incremental changes in the report clearly benefited Ms. Brewer, the defendant's close relative. Although there is no direct testimony indicating that the defendant was acting intentionally or knowingly to benefit Ms. Brewer, a rational juror could certainly draw that inference from the course of events. The jury resolves all conflicts in testimony, and we may not substitute our inferences for reasonable inferences drawn by the jury. A rational juror could have found all the essential elements of official misconduct beyond a reasonable doubt.

In the alternative, the defendant argues that pursuant to subsection (c) of the statute, the jury should have found him not guilty. This subsection provides that

8. **Official misconduct**—(a) A public servant commits an offense who, with the intent to obtain a benefit or to harm another, intentionally or knowingly:
    (1) commits an act relating to the servant's office or employment that constitutes an unauthorized exercise of official power;
    (2) Commits an act under color of office or employment that exceeds the servant's official power;
    (3) Refrains from performing a duty that is imposed by law or that is clearly inherent in the nature of the public servant's office or employment;
    (4) Violates a law relating to the public servant's office or employment; or

It is a defense to prosecution for this offense that the benefit involved was a trivial benefit incidental to personal, professional or business contact, *and involved no substantial risk of undermining official impartiality.*

T.C.A. § 39–16–402(c) (emphasis added). We respectfully disagree.

█ We need not decide whether the benefit involved was trivial or incidental because the defendant's acts plainly involved a substantial risk of undermining official impartiality. If the chief of police is able to alter an accident report to coincide with a relative's perception of events, the integrity of the entire system is in jeopardy. The defendant's actions cast a pall over all investigations conducted by his department and undermined public confidence in his impartiality and that of his officers. Even if the jury agreed that the benefits were "trivial and incidental," a rational juror could conclude that the defendant's actions undermined official impartiality. We affirm the defendant's conviction for official misconduct.

## II

### Coercion of a Grand Juror

The jury also convicted the defendant of attempting to coerce Gilda Staggs, an alternate grand juror. The defendant contends that his conduct did not constitute coercion as defined by T.C.A. § 39–11–106(a)(3). We disagree.

Staggs testified that she served as an alternate grand juror during the first six

    (5) (Receives any benefit not otherwise authorized by law).
    (b) For purposes of subdivision (2)(2), a public servant commits an act under color of office or employment who acts or purports to act in an official capacity or takes advantage of such actual or purported capacity.
    (c) It is a defense to prosecution for this offense that the benefit involved was a trivial benefit incidental to personal, professional or business contact, and involved no substantial risk of undermining official impartiality.
    (d) An offense under this section is a Class E felony.
T.C.A. § 39–16–402.

months of 1990.[9] During March or April of that year, the defendant approached her while she was sitting in the employees' kitchenette. He asked her if she had been on the grand jury lately. She explained that she had not been called in a while. Then he told her that if she happened to sit on the grand jury when the district attorney general presented a case, to "throw it out" because the defendant "wouldn't believe a damn thing he says." Her response was that she could not do that. He then asked her to come into his office because he and Guy Brewer wanted to talk to her. The defendant told her that there were people in her office who were trying to cut his throat and hers as well. He assured her that her job was safe because he had three commissioners on her side. He asked her not to say anything to anyone about their conversation.

A person commits the offense of coercion of a juror by influencing or attempting to influence a juror in the exercise of the juror's official power or by influencing or attempting to influence a juror to vote or not to vote in a particular manner by means of coercion. T.C.A. § 39–16–508(a)(1)–(2). The jury could reasonably infer from the defendant's remarks in the kitchenette that he was asking her to vote against any indictments the district attorney general brought before the grand jury. The only question is whether the second conversation constitutes coercion.

■ The legislature has defined "coercion" as "a threat, however communicated, to: (A) Commit any offense; (B) Wrongfully accuse any person of any offense; (C) Expose any person to hatred, contempt or ridicule; (D) Harm the credit or business repute of any person; or (E) Take or withhold action as a public servant or cause a public servant to take or withhold action." T.C.A. § 39–11–106(a)(3). According to the statute, *any* communication of a threat, whether overt or veiled, qualifies as a threat. The defendant, after asking Staggs to vote against indictments brought by the district

attorney general, invited her into his office and closed the door. He then told her that her position with the clerk's office was in some jeopardy but that he had three commissioners who would support her. Although the defendant made no overt threat, a reasonable juror could infer that the defendant was telling Staggs that he had influence over her job and that unless she cooperated with him in his effort to avoid indictment by the grand jury, her job could be in real jeopardy. Employment is surely related to any person's business reputation and the loss of a position could certainly harm both one's reputation and one's credit. The evidence is sufficient for a rational juror to conclude that the defendant had threatened Staggs with the loss of her job if she did not vote as he wished during grand jury deliberations. This action constitutes coercion of a juror.

## III

### Jury Instruction on the Statutory Defense

The defendant contends that the trial court erred by not instructing the jury that if they had a reasonable doubt that the benefit involved was a trivial benefit incidental to personal, professional or business contact, and involved no substantial risk of undermining official impartiality, then it was the jury's duty to find the defendant not guilty. *See* T.C.A. § 39–16–402(c). The record includes the jury instructions as the trial court read them to the jury. The trial court instructed the jury twice about the statutory defense to the offense of official misconduct. The first instruction was included as part of the instruction on official misconduct and tracked the words of the statute. The second instruction is included in a section on defenses to the crimes charged. The instruction is as follows:

It is the theory of this defendant that he is not guilty of official misconduct, in violation of 39–16–402, because even if you, the

---

9. At first Staggs was confused as to the year in which she served. She testified on direct and during cross-examination that she was on the grand jury in 1989 and that her conversations with the defendant took place in the spring of that same year. The state recalled her to the

stand and she corrected her earlier testimony. The Clerk of the Circuit Court produced grand jury records showing that Staggs served as an alternate grand juror during the first six months of 1990.

jury, find that the defendant violated the penal provision of the act, it is a defense to prosecution of the statute if the benefit involved was a trivial benefit, incidental to personal, professional, or business contact, and involved no substantial risk of undermining official impartiality.

Therefore, if you, the jury, *find that you have a reasonable doubt as to whether any benefit involved in the case at bar was a trivial benefit, incidental to personal, professional, or business contact, and involved no substantial risk of undermining official impartiality, then you must find the defendant not guilty.*

The trial judge gave the instruction the defendant now argues should have been given. This issue has no merit.

## Conclusion

The evidence presented at trial is legally sufficient to sustain Billy Harold Brewer's convictions for official misconduct and coercion of a juror. The trial court did not err by denying defendant's motion for judgment of acquittal, and the trial court's instructions were a full and complete statement of the applicable law. The judgment of the trial court is affirmed.

WELLES and HAYES, JJ., concur.