IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2007 Session

**STATE OF TENNESSEE v. ALISHA J. GLISSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2002-C-1508     Seth Norman, Judge**

_____

**No. M2006-02115-CCA-R3-CD - Filed March 5, 2008**

_____

The Defendant, Alisha J. Glisson, was convicted of felony murder, aggravated robbery, and three counts of attempted aggravated robbery. She was sentenced to an effective sentence of life imprisonment. On appeal, the Defendant presents a single issue for our review: whether the proof is sufficient to support her conviction for felony murder. She argues that the State failed to show that she was criminally responsible for the death of the victim and, alternatively, failed to sufficiently corroborate the testimony of the accomplices. After a review of the evidence in the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Alisha J. Glisson.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

This case arises from the shooting death of William R. "Randy" St. Laurent ("the victim"), which occurred in front of the Defendant's apartment during the early morning hours of December 15, 2001. Following the Defendant's statements and statements from the Defendant's accomplices to police, a Davidson County grand jury indicted the Defendant, along with her accomplices, Michael Wayne Henry, Andrew N. Warner, and David Sullivan, Jr., for first degree premeditated murder (the victim), first degree felony murder (the victim), aggravated robbery (Cortney Perry), two counts of aggravated kidnapping (Tiffany Bennett and Lucas Norris), and three counts of attempted

aggravated robbery (the victim, Tiffany Bennett, and Lucas Norris). A jury trial was held in March 2006.

The testimony presented at trial established that, in December 2001, Michael Henry was unemployed and living in his car. Henry stated that he was selling his "prescriptions" to support himself. Henry went to the Defendant's apartment on December 14 to purchase drugs. The Defendant, whom Henry had known for approximately ten years, proposed a plan to rob the victim, and Henry agreed. According to Henry, he was not acquainted with the victim.

After the Defendant and Henry discussed the robbery plan, Sullivan and Warner arrived at the Defendant's apartment. Henry stated that he had never met Sullivan or Warner prior to December 14. Henry described Sullivan as a "Mexican, he had short cut hair, about six foot or so" and Warner had "freckles" and was "kind of a big guy."

Sullivan and the Defendant were dating. Warner and Sullivan were in the military together and had become friends prior to December 14. According to Warner, Sullivan came to his room on December 14 and, following a conversation, the two men headed from Clarksville to Nashville to "beat up" the victim and take money from him.

While the Defendant, Henry, Sullivan, and Warner were gathered at the Defendant's apartment, they devised a plan to rob the victim. They believed the victim had approximately $30,000 in cash and a large amount of cocaine in his possession. The Defendant informed the men of the location of the victim's apartment, an apartment complex in Hermitage. It was believed that the victim would not be present in his apartment; the victim was supposed to be out with the Defendant "partying." The plan was to rob the apartment while the victim was out with the Defendant and share the proceeds.

Henry, Sullivan, and Warner proceeded to a local motel. Henry was dressed in a pair of white corduroy pants, a black hooded sweatshirt, and a black leather coat. Henry also wore a wig of "shoulder length blond hair" that evening. Sullivan and Warner changed clothes at the motel, and Henry smoked marijuana. Sullivan was dressed in black Army fatigues and Warner was wearing a long trench coat. Sullivan and Henry had guns, and Warner was armed with a "stun gun."

While at the motel, Sullivan was on the telephone and then said, "let's go." Thereafter, Henry drove Sullivan and Warner to the victim's apartment complex. According to Warner, once in the parking lot, Sullivan telephoned the Defendant to make sure they had the correct address. Around 10:30 p.m., Sullivan and Warner knocked on the door of Apartment 313. Henry stated that he returned to the car and telephoned the Defendant to verify the address.

Mr. Lucas Norris, who was at home with his fiancé, Tiffany Bennett, and two children, opened the door. According to Mr. Norris, one of the robbers attempted to enter the apartment, but he resisted. Another male then appeared and pointed a gun at his head. Mr. Norris described the two men—one was a short, "dark-skinned" Hispanic man and the other was a "taller" Caucasian man.

The Caucasian individual was displaying a weapon. Mr. Norris did not recall whether the Hispanic male was armed.

The two men ordered Mr. Norris and Ms. Bennett to get on the floor, and they complied. The two men referred to "owing Randy" and asked for the "stash." The robbers quickly realized they had entered the wrong apartment and left; the encounter lasted less than ten minutes, and no property was taken. They told Mr. Norris that they were with the government and not to call the police. After the robbers left, Mr. Norris locked his door, looked through the peephole, and observed the men enter the apartment next door, Apartment 314. Mr. Norris spoke with police the following day.

Henry joined Sullivan and Warner as they entered Apartment 314, where the victim's girlfriend, Cortney Perry, was present. Sullivan was brandishing a weapon upon entry. Henry pointed his weapon at Ms. Perry and told her to stay out of the way. The three men asked Ms. Perry where the drugs were located, but she stated that she did not know what they were talking about. She continued to ask the men to leave. They began searching the apartment for drugs, and Henry discovered a "pound of weed." They also took Ms. Perry's jewelry and about $1500 in cash. As they were exiting the apartment, Ms. Perry followed the robbers asking them to return her belongings, which they refused to do.

The three men returned to the motel they had visited earlier in the evening and made several telephone calls. They telephoned the Defendant "to find out where [the victim] was at with his stuff." According to Henry, the Defendant was "riding around" with the victim in a limousine. The Defendant informed them that she had seen the "stuff" earlier in the evening but that she did not know if he still had it on him. The Defendant also relayed that she and the victim would be ending the evening at her apartment.

Henry drove to the Defendant's apartment, and the three men waited for the Defendant and the victim to return. The men remained in contact with the Defendant by telephone until she returned to her apartment. According to Henry, as the limousine was nearing the apartment, the Defendant stated "don't do it" and claimed that she wanted no further part in the robbery plan. Warner testified that he never heard the Defendant say anything about aborting the plan.

Henry testified that the limousine pulled into the parking lot and stopped in front of the Defendant's apartment. Sullivan and Warner rushed the limousine at gunpoint, yelling at the victim to "get down." Warner tried to subdue the victim with the stun gun, and the victim fell back into the limousine and "wiggled his way across the back seat." Henry came around to the other side of the vehicle and opened the door. The victim got of the vehicle "swinging" his arms, and a struggle ensued. Henry struck the victim with the gun, and the gun went off, killing the victim.

Henry, Sullivan, and Warner ran to Henry's car and drove to a different motel, where they stayed for the remainder of the night. Warner spoke to the Defendant the following day. Also on the day after the incident, Henry took the marijuana and jewelry, telling the other two men he was going to sell them and would return; however, he did not return. Henry eventually sold the

marijuana and hid the gun in some bushes at his parent's house. He stated that he did have contact with Sullivan and Warner after the shooting by telephone but that he never saw them again. According to both Warner and Henry, they had no further contact with the Defendant. Sullivan went "AWOL" from the military and was incarcerated at the time of the Defendant's trial.

Both Henry and Warner testified against the Defendant at trial and implicated her in the crimes. On cross-examination, Henry and Warner admitted that they hoped for a better plea agreement in exchange for their testimony. Henry also acknowledged that he occasionally exchanged pills and marijuana with the Defendant and that he was at the Defendant's apartment on December 14 to get pills and marijuana.

The State called Mr. Norris and Ms. Perry in an attempt to corroborate the testimony of Henry and Warner. Both provided an account of the events. Ms. Perry stated that she was able to identify the robbers from police photographs.

The State also called Meredith Runion, who testified that she was in the limousine with the Defendant and the victim on the evening of December 14. She also stated that, after leaving the limousine, she accompanied the Defendant to a motel parking lot and that, from there, they returned to the Defendant's apartment. After returning to the Defendant's apartment, Ms. Runion changed clothes, and the victim arrived to pick them up. Ms. Runion then observed "two or three" men dressed in black use a "taser gun" on the victim, and she heard a gunshot.

Detective Danny Satterfield of the Metropolitan Nashville Police Department, testifying for the State, stated that he arrived on the scene during the early morning hours of December 15. He was responsible for investigating the shooting of the victim and conducted several interviews with the Defendant. In a May 21, 2002 interview with the Defendant, the Defendant admitted that she devised a home invasion plan with Warner, Sullivan, and Henry "to get [the victim's] weed while he was not home." She further acknowledged that she knew the three men had gone to the victim's apartment and not found anything valuable. After the unsuccessful robbery of the apartment, the plan changed to robbing the victim of what he "had on him." She also stated that she went to a motel parking lot that evening looking for Henry. A videotape of the interview was entered into evidence and played for the jury.

Detective Satterfield also testified that he conducted an interview with Michael Henry. After speaking with Henry, he recovered the weapon used in the shooting.

Following Detective Satterfield's testimony the State rested its case. The Defendant did not testify or offer any witnesses in her defense.

The Defendant made a motion for judgment acquittal, which the trial court granted as to the premeditated first degree murder count and the two counts of aggravated kidnapping. The remaining counts of felony first degree murder, aggravated robbery, and three counts of attempted aggravated robbery were submitted to the jury. The jury found the Defendant guilty as charged.

A sentencing hearing was held on April 26, 2006. The trial court imposed an automatic sentence of life imprisonment for the felony murder conviction. See Tenn. Code Ann. § 39-13-208(c). The trial court further ordered the Defendant to serve a term of eight years as a Range I, standard offender for the aggravated robbery conviction and terms of three years as a Range I, standard offender for each attempted aggravated robbery conviction. All of the foregoing sentences were ordered to be served concurrently.

Following trial, the Defendant filed a motion for judgment of acquittal/new trial challenging the sufficiency of the evidence for the felony murder conviction. The trial court denied the Defendant's motion. This appeal followed.

**ANALYSIS**

On appeal, the Defendant raises several challenges to the sufficiency of the evidence supporting her conviction for felony murder. The Defendant claims that her felony murder conviction cannot stand because the only plan between her and Sullivan, Warner, and Henry was to rob the victim's apartment, not the person of the victim and, therefore, she is not criminally responsible for the attempted aggravated robbery resulting in the victim's death. The Defendant also challenges the sufficiency of the evidence on the basis that the accomplice testimony was not corroborated. Finally, she states that the trial court erred in denying her motion for judgment of acquittal on the felony murder count.

First, we note that the trial court, by written order, explicitly overruled the Defendant's motion for judgment of acquittal/new trial on the felony murder count, reasoning as follows:

Detective Satterfield testified that the [D]efendant told him in the interviews that she and the co-defendants planned to carry out the robbery at [the victim's] apartment, knowing that only Ms. Perry would be home. When the co-defendants' efforts turned up substantially less cash and valuables than they had anticipated, the [D]efendant admitted that the plan changed and their intent was then to rob [the victim] himself.

The [D]efendant told Detective Satterfield that she had maintained contact with the co-defendants by phone the entire time the events were taking place. She stated that she had talked to the co-defendants between the robbery of Ms. Perry and [the victim], a fact that Mr. Henry corroborated in his testimony. Also, earlier that night, the co-defendants had gotten a motel room where they made preparations to execute their plan. Ms. Runyan [sic] said that after riding around in the limousine with the [D]efendant, they drove to a motel parking lot. She said that she could not remember which motel it was or why they were there, but that the two remained there for about ten minutes before heading to the [D]efendant's apartment. Apparently, in the videotaped interview, the [D]efendant told Detective Satterfield that she went to the motel to find Mr. Henry.

Considering the testimony of all the parties at trial, it is not unreasonable that the jury arrived at the conclusion that the [D]efendant played a role in the commission of the crimes in this matter. The [D]efendant herself provided statements corroborating the testimony of the co-defendant accomplices, despite the fact that she did not testify at trial. Detective Satterfield's testimony describing the interviews with the [D]efendant, along with the videotaped recordings thereof, seems to have adequately linked the [D]efendant with all of the offenses charged in the indictment.

Moreover, on appellate review of a denial of a motion for judgment of acquittal, we apply the same standard as a question of the sufficiency of the convicting evidence. See, e.g., State v. Brewer, 945 S.W.2d 803, 805 n. 2 (Tenn. Crim. App. 1997).

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2). The mental state required for conviction of felony murder is the intent to commit the underlying offense. Tenn. Code Ann. § 39-13-202(b). In this case, the underlying felony was

attempted aggravated robbery. A person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense,

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a). The aggravated robbery charge in this case required the State to prove beyond a reasonable doubt that the robbery of the victim was "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

The Defendant presents a two-fold sufficiency argument challenging her felony murder conviction. First, the Defendant asserts that the evidence was insufficient for a jury to conclude beyond a reasonable doubt that she was criminally responsible for the attempted aggravated robbery which resulted in the victim's death. She contends that she had no criminal intent to commit the attempted aggravated robbery of the victim's person and cannot, therefore, be guilty of felony murder. She points to the testimony of Henry that she "specifically and unequivocally stated that she wanted no part of [the robbery of the victim] and would not participate." The Defendant's arguments are misplaced. Our law supports the Defendant's convictions under the theory of criminal responsibility.

Tennessee statutes provide that a person is "criminally responsible for an offense committed by the conduct of another if: [A]cting with intent to promote or assist the commission of the offense, or to the benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." Tenn. Code Ann. § 39-11-402, Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, a defendant's presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which that defendant's participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that the offense is to be committed, and share in the criminal intent of the principle in the first degree." State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

In this case, the record reveals that the Defendant both acted with the intent to "benefit in the proceeds or results of the offense" and "direct[ed] . . . another person to commit the offense." See Tenn. Code Ann. § 39-11-402(2). The Defendant was the common denominator bringing all three men together to commit this offense. Henry and the Defendant had been acquainted with each other for over ten years. The Defendant and Sullivan were dating; Sullivan and Warner were in the military together. Both Henry and Warner testified at trial and implicated the Defendant in the attempted aggravated robbery, providing testimony in support of the State's theory that the Defendant was the "mastermind" behind the robbery plot.

Henry, Sullivan, and Warner gathered at the Defendant's apartment on December 14, 2001, and forged a plan to burglarize or rob the victim's apartment, where they believed they would find drugs and money. They knew the victim would not be in the apartment because the Defendant was supposed to be out with the victim "partying." When the burglary and robbery at the victim's apartment proved relatively unsuccessful, the plan changed to rob the victim himself. The Defendant, who had remained in contact by telephone with Henry, Sullivan, and Warner throughout the evening, told the three men that she and the victim would be returning to her apartment at the end of the evening. The men drove to her apartment and waited for the Defendant and the victim to arrive. Henry, Sullivan, and Warner rushed the limousine; a struggle ensued, and the gun went off, killing the victim. Henry and Warner both testified that the plan was to share the proceeds with the Defendant.

In addition, the Defendant admitted her involvement in the commission of the offense to Detective Satterfield. Her videotaped confession was introduced into evidence. As noted by the trial court in denying the Defendant's motion for a judgment of acquittal/new trial, "the [D]efendant admitted that the plan changed and their intent was then to rob [the victim] himself." She also acknowledged that she maintained contact with the men by telephone, informing them of her and the victim's whereabouts.

Ms. Runion testified that she was riding in the limousine with the Defendant and the victim that evening. After exiting the limousine, Ms. Runion accompanied the Defendant to a motel parking lot before returning to the Defendant's apartment. The Defendant told Detective Satterfield that she had gone to a motel looking for Henry following the unsuccessful robbery at the victim's apartment.

-8-

We also note that the issue of whether the Defendant wanted no further participation in the robbery plan was a question of her intent to commit the underlying felony. This issue was a factual issue for the jury to resolve. Moreover, even if Henry's testimony—that the Defendant did not want the three men to go through with the robbery—was taken as true, such was not sufficient to establish an affirmative defense to the crime. See Tenn. Code Ann. § 39-12-104 (renunciation "is an affirmative defense to a charge of criminal attempt . . . [where the defendant], after committing the criminal attempt . . . prevented the successful commission of the offense attempted . . . under circumstances manifesting a complete and voluntary renunciation of the [defendant's] criminal purpose").

We conclude that the Defendant's direction and involvement in the commission of the attempted aggravated robbery, as well as her intent to benefit from the robbery, rendered her criminally responsible for the attempted aggravated robbery of the victim. The killing of the victim occurred during the perpetration of the attempted aggravated robbery. The evidence presented at trial supported the jury's decision that the Defendant was an active participant in the attempted robbery and was therefore "accountable for all consequences flowing from the attempted robbery." See State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000).

As her second challenge to the sufficiency of the convicting evidence, the Defendant argues that State failed to provide sufficient evidence to corroborate the accomplice testimony of Warner and Henry. It is well settled that, "[i]n Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). This "very salutary rule" is designed to prevent the "obvious dangers" of allowing a defendant to be convicted solely on the basis of an accomplice's testimony. Sherrill v. State, 321 S.W.2d 811, 814 (Tenn. 1959). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate the testimony of an accomplice. State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).

With respect to the nature, quality, and sufficiency of the evidence necessary to corroborate an accomplice's testimony, this court has held as follows:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.
>
> . . . .

The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplices testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

State v. Griffis, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (citations omitted).

The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). In other words, the corroboration must include some fact establishing the identity of the defendant as a criminal actor. Boxley, 76 S.W.3d at 387. It is generally for the trier of fact to determine whether sufficient corroboration exists. Id. (citing Shaw, 37 S.W.3d at 903). However, as this Court has previously pointed out, "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony." Id. (quoting Griffis, 964 S.W.2d at 589).

From consideration of the proof in the record before us, we find the evidence sufficient to corroborate the testimony of the accomplices Henry and Warner. The accomplices' testimony was corroborated by the Defendant's confession; the taped conversation corroborated numerous elements and details of the accomplices' testimony. While neither the accomplices' testimony nor the confession standing alone would be sufficient to establish the crime, these bits of evidence taken together are sufficient to support to the Defendant's conviction. See generally State v. Stanley Lawson, No. 01C01-9607-CR-00320, 1997 WL 661483, at *5 (Tenn. Crim. App., Oct. 24, 1997) (defendant's statements to police were sufficient corroboration of crime of incest).

## CONCLUSION

Based upon our review of record, we conclude that the evidence is sufficient to support the Defendant's conviction for felony murder based upon a theory of criminal responsibility. Moreover, the evidence is sufficient to corroborate the testimony of the accomplices. The judgments of the trial court are affirmed.

_____
DAVID H. WELLES, JUDGE