IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 12, 2008

## STATE OF TENNESSEE v. DEONTE McBEE

**Appeal from the Criminal Court for Shelby County**
**No. 03-04435     W. Fred Axley, Judge**

---

**No. W2007-01719-CCA-R3-CD   -   Filed August 24, 2009**

---

The Defendant, Deonte McBee, appeals from his convictions of first degree felony murder in the perpetration of robbery; especially aggravated robbery, a Class A felony; and four counts of aggravated robbery, a Class B felony. He was sentenced to life for the murder conviction, to twenty-five years as a violent offender for the especially aggravated robbery conviction, and to twelve years as a Range I offender for each of the aggravated robbery convictions. The aggravated robbery convictions were imposed consecutively to each other and to the murder conviction, and the effective sentence is life plus forty-eight years. In this appeal, the Defendant claims (1) that there was insufficient proof to support the felony murder conviction, (2) that the trial court erred in instructing the jury to consider the murder offense and its lesser included offenses in sequential order, and (3) that the trial court erred in giving a criminal responsibility instruction. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

David Christensen, Memphis, Tennessee (on appeal); and William Massey and Lorna McClusky, Memphis, Tennessee (at trial), for the appellant, Deonte McBee.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and Paul F. Goodman and Tracye N. Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

At the trial, Phyllis Hale testified that she was the mother of the victim[1], James Ryan Hale, and that he lived with her. She said the victim was celebrating his birthday on September 18, 2002. She said that her son worked as a free-lance tattoo artist, that he left her home around 5:00 or 6:00

---

[1] Although this case involves multiple shooting and robbery victims, we use the term "victim" to refer to James Ryan Hale, the individual who was killed.

p.m. with his best friend, Johnny Mack Bateman, and that he had several people whom he planned to tattoo. She said that she was awakened by her fourteen-year-old son around 1:30 a.m. on September 19 who told her that a friend of the victim's was at the door. She said the friend, Diana Ray, told her that the victim had been shot. She said that she went outside to go to the hospital around 2:30 or 3:00 a.m., but that she saw police officer J.D. Simon, who told her the victim was dead.

Walter Lane testified that he and his brother, Bobby Strickland, were living together in September 2002. He said that at about 9:30 p.m. on September 18, the victim came to their house to give tattoos to several people. He identified his brother, himself, Tammy Hughes, and Anthony Hill as being present. He denied that Ms. Hughes was his girlfriend. He said that there were also two women whose names he did not know who came to the house that evening to see about getting tattoos. He said that around 11:30 p.m. to 12:45 a.m., everyone except his brother was assembled in the dining room watching the victim tattoo Ms. Hughes when the Defendant and Chanceller Chatman knocked on the door and entered. He identified the Defendant as someone he had known since the Defendant was thirteen or fourteen years old and Mr. Chatman as someone he had known through the neighborhood for three or four years. He said that both men had been in his home to view sports on previous occasions. He said that one of the men said they had come to watch the victim give tattoos. However, he said that Mr. Chatman came behind him with a gun and that the Defendant raised a gun and said, "Y'all b------ know what time it is." He said that everyone surrendered their money and that Mr. Chatman took it. He said that the Defendant and Mr. Chatman told them to "get naked" and that everyone but him had taken off their clothes. He said that Mr. Chatman ran around the house, kicking holes in the walls, pulling out drawers, and saying that he knew there was more money in the house. He said the Defendant held everyone in a corner at gunpoint, fired his gun at the floor, and stated, "I ain't playing with y'all." He said Mr. Chatman took his brother to the back room, where his brother had a locked chest with books in it, and demanded that Mr. Lane's brother open the chest. He said Mr. Chatman hit the gun against the wall, causing it to fire. He said the bullet came through the wall and struck the Defendant. He stated that the Defendant yelled, "[T]hey shooting," said, "I shoot," and began firing, striking him, the victim, and Ms. Hughes. He said that he ran into the back room to see if his brother had been shot and that he passed Mr. Chatman in the hallway. He said that Mr. Chatman left without firing more shots but that the Defendant continued to fire as he fell out of the house.

Mr. Lane acknowledged that he had several felony convictions, including forgery, burglary, drug offenses, and handgun possession offenses, and that he had been to juvenile court for a child support matter. He said that on the night in question, he smoked a marijuana "blunt" and drank three Bud Light beers. He denied that he had a gun or had seen anyone other than the Defendant and Mr. Chatman with a gun and that the others had been naked and unable to conceal a weapon.

On cross-examination, Mr. Lane acknowledged that he had not told the police about the two unidentified women who were at the house. He said that the police probably misunderstood him to say that he had known the Defendant for three or four years, when he had in fact known the Defendant for much longer. He denied any knowledge of any drugs being delivered to his home that evening and stated that there were no drugs in the home other than the "blunt" he had smoked earlier.

-2-

He admitted that he had said first that he did not know whether a .45 Glock handgun would "jump" when fired but then acknowledged his previous statement in which he said he had seen this type of gun "jump." He said the shot that hit him went through his left arm from front to back. He said he never saw the Defendant aim the gun at the victim. He admitted that the photographs introduced as exhibits did not show the holes that had been kicked in the walls but stated that the damaged areas were not depicted in them. He acknowledged his previous statement that he did not know whether the Defendant or Chatman shot him.

Anthony Hill testified that he was at Walter Lane's home on the evening of September 18, 2002, where he and others were being tattooed by the victim. He identified those present as Mr. Lane, Bobby Strickland, Tammy Hughes, and two women whose names he did not know. He said that he met one of the unidentified women earlier that day, that she admired his tattoos, and that when she called him that night, he invited her over.

Mr. Hill acknowledged that he had several prior convictions, including six for felony drug offenses and one for theft. He admitted that he was on probation and that a condition of his probation "was to show up in court." He said that he was in the business of selling drugs in September 2002 and that he called the Defendant on September 18 because he wanted to buy seven grams of crack cocaine and seven grams of powder cocaine from the Defendant, although he said that in the past he had only sold drugs to the Defendant.

Mr. Hill testified that on the night in question, the Defendant and Chanceller Chatman came into the house and were looking at the tattoo that Ms. Hughes was getting. He said that he turned around to purchase the cocaine from the Defendant and saw that both the Defendant and Chatman had guns. He said that he asked the Defendant "what was up" and that the Defendant said, "You know what this is." He said that he was in disbelief that they were robbing him. He said that the Defendant and Chatman told them to get naked. He said he threw $740 on a table, which he said Chatman retrieved. He said he heard one of the men tell Lane that they did not want his money. He stated that he did not want to take off his clothes and that the Defendant said, "You think I'm playing," and fired a shot at Hill's feet.

Mr. Hill testified that Chatman took Strickland into the back of the house, while the Defendant held everyone else at gunpoint. He said that he asked the Defendant why he was doing this and that the Defendant responded that "[Mr. Hill] was talking to somebody on the phone about telling on him." Mr. Hill testified, "I told him I don't even know him. I told him I know of him but I don't know him. I know you." He stated that he heard Mr. Chatman demand that Mr. Strickland open the trunk, Mr. Strickland say he could not open it, and a gunshot.

Mr. Hill testified that the Defendant started shooting and that the Defendant and Mr. Lane ran outside. He said that they shot into the house from outside. He stated that Lane, Hughes, the victim, and he were all shot.

Mr. Hill testified that he did not talk to the police that night. He stated he had pending cases and left the scene. He said that he talked to the police two or three days later.

Mr. Hill testified that he had known the Defendant since the Defendant was ten or twelve years old. He stated that he had known Mr. Lane for twenty-five years and Mr. Strickland for about fifteen years. He said that he had known the victim for about five years and that he had about six tattoos from the victim. He said that the Defendant and Chatman were not strangers at Mr. Lane's home and that there had been no forcible entry on the evening in question.

Mr. Smith identified a photograph of the Defendant's Nissan Maxima. He said that he was familiar with the car because he had assisted the Defendant by driving one of the Defendant's two cars to a store to have stereo equipment taken from one and put into the other.

Dr. O'Brian Cleary Smith performed the autopsy of the victim. He testified that the victim had a bullet wound to the left side of the jaw which went across the jaw bone, under the tongue, severed the subclavian artery and vein, and entered the top of the right lung. He said that the victim's death occurred from his chest filling with blood, injury to the blood vessels, compression of the lung, and damage to the lung. He said that there were no drugs detected in the victim's body and that his blood alcohol level was .058 percent. He said that according to emergency room records, the victim was pronounced dead about twelve minutes after he arrived there. He classified the cause of the victim's death as a gunshot wound to the neck and chest.

Officer Shan Tracy of the Memphis Police Department testified that he went to the hospital and took thumb prints of the victim in order to identify the victim. He said that he went back to the hospital later and took a bullet from Officer Lynn, which he took to the property room. He said that the bullet had been recovered from an individual named Shawn Jackson. He said that he was unable to perform a gunshot residue test on Mr. Jackson because the patient was in surgery.

Officer David Galloway of the Memphis Police Department testified that he responded to the crime scene that had been previously identified as the home of Mr. Lane and Mr. Strickland. He said that he collected evidence, sketched the scene, and took photographs. He identified shell casings, a bullet, two metal fragments recovered outside the home, and possible bullet holes in the exterior wall, porch, and door frame of the house. He identified a .40 caliber spent shell casing found in the living room, a 9 millimeter spent shell casing found in the bedroom, and a bag of what was believed to be marijuana found in the bedroom. He said that he did not observe a box of .357 bullets on a counter next to a television inside the home.

Officer Patricia Turnmire of the Memphis Police Department testified that she went to recover weapons at an apartment complex on September 19, 2002. She said that the weapons were located outside in the area of a maintenance shed where a gate was used to contain children or animals. She described the weapons as being .40 caliber and 9 millimeter. She said one live round was in the chamber and two live rounds were in the clip of the .40 caliber. She said the 9 millimeter's chamber and clip were empty.

Officer Eric Hutchison testified that in September 2002, he was a detective in the Homicide Bureau of the Memphis Police Department and was the case coordinator for the victim's homicide. He said that he sent the weapons and ammunition recovered to the Tennessee Bureau of

Investigation for analysis. He said that Officer Tim Sims had worked at the crime scene at the apartment complex but that Officer Sims was now deceased.

Special Agent Tommy Heflin of the Tennessee Bureau of Investigation testified as an expert in firearms identification. He said that the TBI had examined evidence from this case in 2002 and 2005 and that he was the examiner in 2005. He said that one of the weapons was a .40 caliber Fabrique Nationale semiautomatic pistol, which he said was sometimes misidentified as being manufactured by Smith and Wesson. He identified the other weapon as a 9 millimeter High Point C9 semiautomatic pistol. He said the .40 caliber weapon would hold as many as eleven rounds and the 9 millimeter weapon would hold as many as nine. He determined that the three .40 caliber cartridge casings had been fired from the .40 caliber weapon. He said that a lead bullet core would have at one time been contained within a .40 caliber copper jacket and that the copper jacked bore markings that indicated it had been fired from the .40 caliber weapon. He stated that the bullet identified as having come from Shawn Jackson had been fired from the 9 millimeter weapon. He said that he was unable to make any identification with respect to two lead fragments and a 9 millimeter class lead core. He identified photographs he took of the evidence he examined. He said that on a semiautomatic weapon, the trigger must be pressed and released each time the weapon is fired.

Tammy Hughes testified that she was at the home of Mr. Lane and Mr. Strickland on the evening of September 18, 2002. She said that Lane, Strickland, Anthony Hill, and the victim were present when she arrived after 10:00 p.m. and that two other women, whose names she did not know, arrived after she did. She said that she watched the victim give tattoos to others and that the victim began giving her a tattoo. She said that she heard a loud banging sound, which she believed to be the door slamming, and that she saw the Defendant and Chanceller Chatman standing inside the door holding guns. She said that the Defendant shot at the floor to get everyone to be quiet. She said the men made everyone move from the dining room to the living room. She said that the Defendant asked if anyone had a pistol and that he said, "[Y]'all b------ know what time it is." She said the men made them surrender their money and undress and that the Defendant stood facing them. She said that she, Lane, Strickland, Hill, and the victim all surrendered money. She could not recall whether the two unidentified women were standing with them at this point. She said that Chatman began searching through the house and that he took Strickland into the back. She said that she heard commotion in the back, Chatman "fussing" at Strickland about not being able to open the chest, and a gun firing and that she saw that the Defendant had been shot. She said the Defendant shouted, "[T]hese m----f------ done shot me," and began shooting. She stated that Mr. Chatman grabbed money as he was running out the door and that the Defendant backed out of the house and shot Lane, the victim, and her. She said the victim was shot as he was running into the kitchen. She said that the Defendant continued firing shots even after he was outside the door threshold. She said that she called 9-1-1 at 1:00 or 1:05 a.m. after the gunfire stopped.

Ms. Hughes testified that she was taken to the hospital and that while there she saw the Defendant coming into the hospital on a stretcher. She said she informed the detective who was there. She said that she did not know the Defendant or Chatman before this night. She identified a photographic lineup from which she had identified the Defendant and said that she had been certain when she made this identification.

Ms. Hughes testified that Strickland and Hill went into the front yard after receiving their tattoos but that she did see them again that evening. She then acknowledged her prior statement in which she said that these two individuals left after being tattooed, and she said stated that although the statement did not say these men returned to the house later, they had done so and were present for the shooting. She also acknowledged that she did not say in her statement that Strickland went into the back of the house with Chatman. She acknowledged that she identified Lane as her ex-boyfriend on direct examination but that she said in her previous statement that he was her boyfriend. She admitted that Lane was paying for her tattoo that evening. She said that she surrendered about $200 but admitted that she said in her previous statement that the amount was $100. She acknowledged her previous statement that she did not think the Defendant was aiming at anyone in particular as he was firing his gun. She denied that anyone other than the Defendant and Mr. Chatman had a gun.

Officer Andrew Hurst of the Memphis Police Department testified that he was dispatched to the Wingood Manor Apartments on September 19, 2002, to respond to a report of an attempted carjacking in which a person named Shawn Jackson had been shot in the stomach. He said that when he and his partner, Chris Joyner, arrived at the apartment complex, the victim had already been transported by ambulance to a hospital. He said that he spoke with Chanceller Chatman, who gave him different versions of the alleged carjacking. He said that he examined the car and found it unusual that there was blood on the outside right rear spoiler. He said that Mr. Chatman reported that Shawn Jackson was shot while sitting in the driver's seat and that although Mr. Chatman claimed to have taken over driving after Mr. Jackson was shot, he did not notice any blood on Mr. Chatman.

Officer Hurst testified that he interviewed Luthia McBee at the apartment complex. He said that the door to Ms. McBee's apartment had been kicked in and that Mr. Chatman stated that he received no answer at the door and kicked it in to gain access to the telephone to call 9-1-1.

Officer Jerry Collard of the Memphis Police Department testified that he was dispatched to the Regional Medical Center in the early morning hours of September 19, 2002. He said that he spoke with Mr. Lane and Ms. Hughes. He said that as he was interviewing Hughes, she looked at a trauma victim who was being taken to surgery and started to cry. He said that she whispered to him that this patient was the person who shot her. He said that at the time, they believed the patient's name to be Shawn Jackson.

Lynette Wahpepah testified that she was a records custodian at the Regional Medical Center. She presented the medical records of Shawn Jackson's, also known as Deonte McBee, hospitalization beginning on September 19, 2002. She stated that there was an envelope of the Defendant's valuables, the contents of which were received by the Memphis Police Department.

A stipulation was read which stated that Memphis Police Department Officer James Bebout collected clothing belonging to the victim and containing a crack pipe and seventy cents. The stipulation provided that a male named Lipford stated to Officer Bebout that another male named Hill left the clothing at an address on Merrycrest and that Lipford had taken the clothes to his parents' home on Watson.

The Defendant began his case-in-chief by calling Officer James Fitzpatrick of the Memphis Police Department, who testified that at 3:40 a.m. on September 19, 2002, he was called to the residence that had been identified previously as Mr. Lane and Mr. Strickland's. He said that while on the scene, he saw a box of .357 magnum shells on a chest of drawers in the front room of the house. He denied that he tagged or collected any evidence.

Officer Frederick Williams of the Memphis Police Department testified that he was sent to the Red Roof Inn on September 19, 2002, to a room that was registered to the Defendant. He said that he had a search warrant and that he recovered a small suitcase, 23.3 grams of crack cocaine, and 33 grams of powder cocaine. He identified photographs of the suitcase, which reflect that it contained cash and a Tennessee identification card bearing the Defendant's name. Officer Williams stated that the cash amounted to $5,505.36. He said that he was with Sergeant Tim Sims on the night in question and that Sergeant Sims had since passed away. He identified a receipt for the hotel room bearing the names of the Defendant and Robert Artell, a Cricket cellular telephone bill addressed to the Defendant, and a title to a 1994 Nissan vehicle in the name of Kenneth Rolls. He said also there was a receipt for the license tag for the car, which was in Luthia McBee's name. Additionally, there was a receipt for Stereo One dated September 7, 2002, although the customer's name did not appear on it.

Officer Tina Crowe Howard of the Memphis Police Department testified that on September 19, 2002, she was called to the apartment complex that was associated with this case. She identified photographs of a Nissan Maxima she observed there, which she said had blood on the right rear spoiler and what appeared to be a bullet hole on the left rear bumper. She said she also observed a white tank top, a gray short-sleeved tee shirt, a beige bath towel, jeans shorts and black and white striped underwear, all of which appeared to be bloody.

The Defendant did not testify. After receiving the proof, the jury found the Defendant guilty of first degree murder in the perpetration of robbery, especially aggravated robbery, and four counts of aggravated robbery. This appeal followed.

## I

The Defendant argues that the trial court erred in denying his motion for judgment of acquittal at the end of the State's proof and at the end of all proof because the evidence was insufficient to support a conviction of first degree felony murder. He argues that the State's proof failed to show that he intended to kill the victim and that he shot in self-defense. The State counters that it was not required to prove an intent to kill in order to obtain a conviction of felony murder. We agree with the State.

On appellate review of a denial of a motion for judgment of acquittal, we apply the same standard as a question of the sufficiency of the evidence. See, e.g., State v. Brewer, 945 S.W.2d 803, 805 n.2 (Tenn. Crim. App. 1997). Our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means we do not reweigh the evidence but presume that the jury has resolved all conflicts in

the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The Defendant was convicted of felony murder, which is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy[.]" T.C.A. § 39-13-202(2) (2006) (amended 2007). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2006). Tennessee's self-defense statute provides

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

T.C.A. § 39-11-611(a)(2006).

First, we note that the Defendant has cited no authority for his proposition that the State was required to prove intent to kill in order to obtain a conviction for felony murder. We note, as well, that this argument is contrary to the language of the felony murder statute, which does not require the intent to kill a victim. See T.C.A. § 39-13-202(2); State v. Walker, 893 S.W.2d 429, 431 (Tenn. 1995). The Defendant's argument that there was no proof of his intent to kill the victim must fail.

Further, the proof is sufficient to sustain the conviction. In the light most favorable to the State, the evidence demonstrates that the Defendant and Chanceller Chatman went to a home where the victim was giving tattoos. Armed with handguns, they demanded money from the victim and the others present. The Defendant shot his weapon at Mr. Hill's feet to intimidate them. The armed Defendant held several of the individuals hostage in the living room of the home while Mr. Chatman forced Mr. Strickland at gunpoint to go to the back of the home and demanded that he open a locked chest. Chatman fired his gun, and the bullet struck the Defendant, who then began firing his weapon at the individuals in the house and continued firing as he and Chatman fled the home. One of the shots struck and killed the victim. The Defendant's argument that he shot in self-defense requires us to reweigh the proof, which we may not do as an appellate court. The evidence is sufficient to support the Defendant's conviction of felony murder in the perpetration of a robbery. The Defendant is not entitled to relief on this basis.

**II**

The Defendant also argues that the trial court erred in instructing the jury that it must find the Defendant not guilty of a greater offense before considering whether he was guilty of the next-lesser offense. The State responds that the Defendant waived consideration of the issue by failure to object to the instructions at trial and that in any event, the trial court properly instructed the jury on the order in which it was to consider the offenses.

The State is correct that the issue was not raised during the trial, although the record reflects that the issue was raised in the motion for new trial. See State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (Pursuant to Tennessee Rule of Criminal Procedure 30(b), "[a]n erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection."); State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1999). In any event, our supreme court held recently that sequential jury instructions satisfy a defendant's right to a trial by jury under Article I, Section 6 of the Tennessee Constitution, including the right to have instructions on charged and lesser included offenses and the right to a unanimous jury verdict. State v. Davis, 266 S.W.3d 896, 905 (Tenn. 2008). We conclude that the instructions as given, requiring sequential assessment of the offenses, did not violate the Defendant's rights to due process and to trial by jury.

### III

The Defendant also argues that the trial court erred in giving an instruction on the theory of criminal responsibility. He claims that criminal responsibility was not charged in the indictment and therefore was not a theory of guilt upon which the State could proceed. The State responds that the Defendant waived this issue by failing to object to the instruction at trial and that the instruction was in accord with the law.

The State is correct that the Defendant did not raise the issue at the trial, although the issue appears in the Defendant's motion for new trial. See Faulkner, 154 S.W.3d at 58; Lynn, 924 S.W.2d at 898-99. In any event, the Defendant is not entitled to relief.

A defendant is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2). Criminal responsibility is not a separate crime but is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). If guilt of the offense via a theory of criminal responsibility for the conduct of another is fairly raised by the proof, an instruction on that theory is proper. Id. at 171.

The proof in the present case supports the criminal responsibility instruction given. There was evidence that the Defendant was armed, that he demanded money which Mr. Chatman took, that he held some of the occupants of the home at gunpoint while Chatman looked for other money and demanded that Mr. Strickland open the chest, and that he shot at the occupants of the home in order to facilitate his and Chatman's flight with money.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

                                            _____
                                            JOSEPH M. TIPTON, PRESIDING JUDGE